[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action for dissolution of marriage was referred to the Regional Family Trial Docket from the Stamford Judicial District. It was tried over a period of several trial days between July 18, 2001 and January 11, 2002. For the first three days of trial the defendant represented himself. Thereafter, the defendant was represented by counsel. The plaintiff was represented by counsel throughout the trial. When the trial began the case was fully contested. On the fourth day of trial the parties reached agreement on all child custody and visitation issues as well as the sale of the marital residence. This agreement was approved by the court (Fisher, J.) on July 31, 2001 and will be incorporated by reference as part of the court's decree with a change in the provisions regarding the sale of the marital residence. The trial was completed with testimony limited to financial issues.
The parties were married on April 7, 1984 in New York City. The parties CT Page 3312 have four minor children issue of the marriage: John A. Champagne, born October 11, 1984; Katherine E. Champagne, born May 13, 1988; Elizabeth A. Champagne, born October 1, 1991; and Caroline M. Champagne, born May 11, 1994. No other minor children have been born to the plaintiff since the date of the marriage. The parties have not been recipients of public assistance during the period of the marriage.
The marriage between the parties has broken down irretrievably and there is no hope of reconciliation. The primary cause of the breakdown was the defendant's physical and verbal abuse of the plaintiff Ample testimony was presented at trial to prove that the defendant has a dominating personality coupled with an explosive temper. As the marriage progressed, his displays of anger and abuse grew more frequent. This progression culminated in incidents in which the defendant physically attacked the plaintiff in front of the children. Certainly there were actions of the plaintiff which contributed to the breakdown. The evidence indicated that the plaintiff had mood swings which helped to precipitate arguments between the parties. She also did some cruel and thoughtless things including the outrageous act of leaving with the children on a Christmas vacation in 1998 without any notice to the defendant. But, the most significant reason for the breakdown of the marriage was the inability of the defendant to control his anger.
The plaintiff is 46 years old and is in good health. She had a short first marriage which ended in divorce. She has her bachelor's degree from Eisenhower College. She is in the process of taking courses to obtain her master's degree in education in preparation to teach elementary school. Before the birth of the first child in 1984 the plaintiff worked full-time as a bookkeeper and in advertising. She has not been employed since that time.
The defendant is 48 years old. This is his first marriage. He is in good health. He holds a bachelor's degree and a master's degree from Stamford University. He served in the United States Army Corps of Engineers on active duty and in the reserves. He is an expert in the field of nonferrous metals and has held important positions in several companies dealing with the trading of these metals. From 1994 through 2000 the defendant had earnings ranging from a low of $642,904 in 1998 to a high of $4,064,904 in 1996. In early 2001 he voluntarily left his employment as CEO of Global Minerals and Metals to become CEO of Nord Resources, Inc., a publicly traded corporation which owns a copper mine in Arizona. He has had no employment income since January 2001 because Nord Resources is engaged in litigation in the federal courts and is subject to a court order under which it is prohibited from paying the defendant's salary of $400,000 per year. The court order permits the salary to be accrued and paid when the litigation is completed. The CT Page 3313 defendant is owed approximately $400,000 in accrued salary and expenses. The litigation has been the subject of mediation and there is a proposed settlement under which it is probable that, within three months, he will be paid his accrued salary and will begin receiving his current salary.
At the time of the marriage the plaintiff had cash assets of about $50,000. In addition, she was and still is a 25% owner of the stock of a private family corporation known as 3B Corporation created by her father to benefit his four children. The evidence is insufficient to determine the value of the plaintiffs interest at the time of the marriage. The liquid assets of the corporation are presently worth $347,000. The corporation also has accounts receivable of $201,000 but owes a management fee of approximately $150,000. Therefore, the plaintiff's interest in the corporation is worth about $99,500. The plaintiff has received distributions from the corporation of about $3,000 per year during the marriage.
Between 1984 and 1990 the plaintiffs parents gave her $20,000 per year which she deposited into joint accounts. Between 1990 and 1999 the plaintiffs mother gave her $10,000 per year which she deposited into joint accounts. Also, sometime soon after 1990 the plaintiffs mother gave the plaintiff $50,000 which she deposited into joint accounts. The plaintiffs mother stopped giving gifts to the plaintiff once this dissolution action began because she was afraid that some of the money might go to the defendant. During the pendency of this action the plaintiff has borrowed $70,000 from her mother, $60,000 of which is evidenced by a promissory note payable on demand.
The plaintiff has a 25% interest in the Alan Seaberg Trust, a testamentary trust established in 1990 at the death of her father. The plaintiffs interest is contingent upon the death of her mother. The primary asset of the trust is a $1,000,000 insurance policy on the life of the plaintiffs mother.
At the time of the marriage the defendant owned a duplex house in California which he had bought in 1976 for $95,000 with a mortgage of $76,000. The property was rented for an amount approximately equal to the amount of the mortgage, taxes, and repairs. The plaintiff became a joint owner in 1993. There was no reliable evidence of the value of the property at the time of the marriage in 1984. But, the property had a value of $580,000 in 1997 when it was part of a tax free exchange in which the parties acquired a condominium in New York.
Also, at the time of the marriage, the defendant owned a condominium in Minneapolis, Minnesota which he had purchased in 1982 for $308,000 with a mortgage of $115,000. This was the first marital home of the parties. CT Page 3314 There was no reliable evidence of the value of the condominium at the time of the marriage. The plaintiff became a co-owner in 1986. The parties did some renovations costing about $20,000 before they sold the property in 1988 for $365,000.
The parties own a residence at 9 Hills End in Weston, Connecticut where the plaintiff lives with the children. Actually, title to the property is in the name of the Champagne Family Trust. This is an inter vivos trust in which the parties have an equal interest. The fair market value of the property is $3,325,000. There is a mortgage with a balance of $800,000. There are unpaid real estate taxes in the amount of $108,648, an unpaid landscaping bill in the amount of approximately $21,219, and an unpaid pool maintenance bill in the amount of $1,392. The property is on the market for $4,200,000 pursuant to the agreement of the parties approved by the court on July 31, 2001. The parties have disagreed over whether and how much to reduce the listing price for the house.
The Champagne Family Trust also owns a condominium at 1 Central Park West in New York City where the defendant is living. This property was purchased in December 1995 for $1,400,000. The property has a fair market value of $2,400,000 subject to a mortgage of $590,000.
The Weston home and the New York condominium are both fully furnished. The defendant makes special claim to two items in the Weston home. The first is a 17th Century English table and the second is an early I 9th century antique copper engraving. The defendant claims that the plaintiff irreparably damaged the table and lost or stole the engraving. The evidence was insufficient to establish either claim or to prove the current value of either item.
In late 2000 and early 2001 the defendant used approximately $400,000 of marital assets to purchase common stock of his new employer, Nord Resources, Inc. This stock was purchased without the permission or knowledge of the plaintiff. The price of the stock at the time of purchase was 12 cents per share. The price per share is now 3 cents per share. The defendant feels that the purchase of this stock was a great opportunity which he could not pass up. His expertise in the copper business is unquestioned and he may eventually be proven correct about the value of Nord Resources. But, he took a huge risk in making this investment with marital assets while the case was pending and while he was not receiving his salary. He has left the parties without any substantial assets other than their real estate holdings. Some of the stock was purchased with retirement assets and some with non-retirement assets.
The plaintiff has an IRA account with Schwab valued at $23,825.16. The CT Page 3315 defendant has an IRA at Salomon Smith Barney with a value of $54,187.50. Some or all of the assets in this IRA are the Nord Resources stock purchased by the defendant. He has an interest in two pensions: a pension from Magma Copper Co. will pay him $1,856.54 at age 65; a pension from Cargill, Inc. will pay him $1,663.48 at age 65. There was no evidence of the present value of these pensions.
The defendant has $170,000 of group term life insurance payable to the children as beneficiaries. Additional group life insurance in an amount of not less than $500,000 is provided for under the terms of the defendant's employment agreement with Nord Resources. But this insurance will not be initiated until the pending litigation is resolved.
The defendant is the custodian of four custodial accounts for the benefit of the three older children with a total value of $192,138.25. The plaintiff is the custodian of seven investment and savings accounts for the benefit of the four children. These accounts have a total value of $60,298.94.
The parities each have their own savings and checking accounts with small fluctuating balances. They each have their own automobiles which are individually financed or leased.
The plaintiff has significant debt in addition to that already mentioned. The plaintiff has an unpaid Visa bill in the amount of $29,657.50 incurred for household and educational expenses. She owes fees to her own attorney in the amount of $89,602.75 as of January 2, 2002. She owes $45,800 for 2001 income taxes through the end of the fourth quarter. She owes a therapy and doctors bills in the amount of $3,654.
The defendant owes his attorneys $10,555.68 as of January 2, 2002. He owes 2001 income taxes in the estimated amount of $75,000. He owes $750 for the visitation facilitator.
Finally, there are fees due to the counsel for the minor children, Attorney Catherine P. Whelan, in the amount of $24,033.30, and to the Guardian Ad Litem, Attorney Elizabeth T. Shame, in the amount of $29,287.50. There is also a fee to the psychological evaluator, Dr. Herbert S. Sacks, in the amount of $7,000.
Commencing on June 15, 1999 the court (Harrigan, J.) ordered the defendant to begin paying the plaintiff unallocated pendente lite child support and alimony in the amount of $25,000 per month. Just prior to the defendant leaving his job at Global Minerals Metals to join Nord Resources the court (Harrigan, J.) reduced his support obligation to $12,000 effective on January 1, 2001. His salary at Nord has never been CT Page 3316 paid and he is now owed approximately $400,000. Therefore, since January 1, 2001 the defendant has made his support payments from marital assets. As a result, the marital assets have been drastically reduced since January 1, 2001. This reduction has been exacerbated by the defendant's purchase of Nord stock which has declined so dramatically in value.
If the defendant is correct, he will eventually be paid his accrued salary and expenses of approximately $400,000. This is the money with which he would have paid his unallocated support if it had been paid to him rather than being accrued. It is not fair to the plaintiff that support was paid from marital assets while the defendant can look forward to receiving the accrued salary in the future. The court has taken this into consideration in the property division.
The unallocated support payments of $12,000 per month were supposed to be used by the plaintiff to support the children and the family home. It is clear that the plaintiff was not as frugal as she should have been. Her financial affidavit reveals some questionable expenditures. When the plaintiff was receiving $25,000 per month she should have been paying the real estate taxes. But there was an unpaid bill of approximately $50,000 when the support was reduced on January 1, 2001 to $12,000 per month. The mortgage, insurance, real estate taxes, utilities, landscaping expenses, and pool bills alone amount to more than $12,000 per month. It is not unreasonable that the plaintiff has been unable to pay the taxes since January 1, 2001. The court has taken these facts into consideration in the property division.
One of the significant issues in the case is whether, in the assignment of assets, to give credit to the parties for the assets which they brought to the marriage. Although it does appear that the defendant brought more assets to the marriage, the court has been unable to determine the value of most of the assets of both parties at the time of the marriage. For this reason, and because of the court's evaluation of all of the criteria in Section 46b-81, no reimbursement will be made of premarital assets or of gifts received by the plaintiff during the marriage.
It is beyond doubt that the defendant has a far superior opportunity for future acquisition of capital assets and income. He is an acknowledged expert in his field and is in the prime of his productive years. His track record shows that he can command and receive steady income well in excess of $500,000 per year. On the other hand, the plaintiff has no earnings history. She arranged her life to stay home with the children and be the wife of a wealthy man. If she completes her teacher training she will earn a small fraction of the defendant's expected earnings. Her ability to accumulate capital assets is dwarfed by CT Page 3317 the defendant's. Having considered this fact as well as the contribution of the parties to the acquisition, preservation, and appreciation in value of their respective estates, as well as all of the other criteria in Section 46b-81, the existing assets of the parties will be divided so that the plaintiff will receive significantly more than 50%.
The court issues the following orders:
1. The marriage of the parties is dissolved.
2. The agreement of the parties dated and approved on July 31, 2001 regarding custody and visitation is incorporated by reference herein with changes to the provisions regarding the sale of the Weston property as set forth below.
3. The defendant shall pay to the plaintiff as unallocated alimony and support the sum of $12,000 per month until the death of either party or the plaintiffs remarriage or cohabitation as defined by statute, whichever shall sooner occur.
4. The above award of unallocated alimony and support is based upon the defendant's base salary of $400,000 only. By April 30 of each year, the defendant shall provide the plaintiff with a copy of his federal tax return of the previous calender year as filed with the Internal Revenue Service. If the defendant has not filed his return by April 30, he shall provide the plaintiff with a copy of the application for extension to file. Regardless, by April 30 of each year, the defendant shall provide to the plaintiff all other documentation, including working papers for the tax return, reflecting compensation received by him during the previous calender year.
5. The defendant shall maintain medical and dental insurance for the benefit of the minor children until each child completes high school or attains the age of nineteen, whichever event shall first occur. The parties shall share equally the cost of all unreimbursed medical, dental, optical, psychological or psychiatric expenses for the minor children. Once each quarter each party shall provide the other a list of all qualifying expenses and any supporting documentation related thereto. Each party shall reimburse the other for such expenses within ten days of the receipt of the same. The defendant shall assist the plaintiff with obtaining and completing whatever forms are necessary for her to obtain COBRA medical insurance. The plaintiff shall be responsible for all payments associates with the same.
6. The defendant shall pay Katherine's private secondary school expenses, including room, board, and tuition. Any other expenses shall be CT Page 3318 paid by the plaintiff
7. In accordance with the prior agreement of the parties, the real property in Weston, Connecticut shall be sold as soon as possible. However, in light of the conflict which has arisen regarding the potential reduction in the listing price, the plaintiff shall have sole and exclusive authority to set the listing price and to accept an offer of sale. The plaintiff is authorized to sign listing agreements and a contract of sale on behalf of the Champagne Family Trust. The defendant is ordered to cooperate in the sale and in signing all necessary closing documents including the warranty deed. From the gross proceeds of the sale the following sums shall be paid: 1) the real estate commission, attorneys fees for the closing, state and local conveyance taxes, and any other closing expenses; 2) unpaid real estate taxes; 3) the first mortgage; 4) the federal and state capital gains taxes due as a result of the sale; 5) the unpaid fees of Attorney Whelan, Attorney Sharpe, and Dr. Sacks in the total amount of $60,320.80; 6) the plaintiffs unpaid fees to Attorney Nemiroff in the amount of $89,602.75; 7) the plaintiffs unpaid Visa bill in the amount of $29,657.50; 8) the landscaping bill and the pool maintenance bill in the total amount of $22,611. The net proceeds after the payment of these sums shall be paid as follows: 70% to the plaintiff and 30% to the defendant. The plaintiff shall have exclusive possession of the property until the sale. The plaintiff shall pay the first mortgage so that it is current at the time of the closing.
8. The New York condominium shall be listed for sale within 30 days from the date of this judgment. The initial listing price shall be $2,400,000. The defendant shall be entitled to select the real estate agency to be used to sell the property. Both parties shall sign the listing agreement on behalf of the Champagne Family Trust. The parties shall accept any offer within 3% of the listing price. The listing price of the condominium shall be reduced by $200,000 every three months until it has been sold. The parties are authorized to make other adjustments in the listing price by mutual agreement in writing. From the gross sales price the following sums shall be paid: 1) the real estate commission, attorneys fees for the closing, state and local conveyance taxes, and all other closing expenses; 2) the first mortgage; 3) all taxes resulting from the sale including depreciation recapture, Federal capital gains tax, New York State capital gains tax, New York State mansion tax, and New York City capital gains tax. The net proceeds after the payment of these sums shall be divided equally by the parties. The defendant shall have exclusive possession of the condominium until the sale. The defendant shall pay the first mortgage payment and the real estate taxes as they come due so that the mortgage and taxes are current at the time of the closing. CT Page 3319
9. The parties shall each retain their own automobiles, shall pay the financing and/or lease payments, and shall indemnify and hold the other party harmless from liability for the same.
10. The parties shall each retain their own savings and checking accounts free and clear of the claims of the other party.
11. The defendant is ordered to transfer to the plaintiff 50% of his pensions with Magna Copper Co. and Cargill, Inc. These transfers are to be effectuated by Qualified Domestic Relations Orders as required by the plan administrators. The defendant shall assist the plaintiff with obtaining all necessary documents from the plan administrators and is ordered to sign any documents necessary to effectuate this transfer. The court will retain jurisdiction until such time as the Qualified Domestic Relations Orders have been approved and the pensions equally divided.
The plaintiffs Schwab IRA and the defendant's Salomon Smith Barney IRA shall be equalized by tax free transfer.
13. The defendant's stock in Nord Resources held outside of his IRA shall be divided equally between the parties.
14. The plaintiff shall retain her interests in the Alan Seaberg Trust and 3 B Corporation free from any claims of the defendant.
15. The plaintiff shall retain all personal property and possessions remaining in the Weston property, except for those items brought to the marriage by the defendant. The defendant shall remove these items within 30 days. If the parties disagree over these items, they are referred to Family Relations for mediation prior to filing motions in court. The defendant shall retain all personal property and possessions remaining at the New York condominium.
16. Each party shall remain the custodian of whatever custodial accounts they currently control for the children's benefit. Any expenditure of such funds shall be made only by agreement of the parties. If the parties are unable to agree on an expenditure, the parties are referred to Family Relations for mediation prior to any motions being filed in court.
17. The defendant shall continue to maintain the existing life insurance in the amount of $170,000 with the plaintiff named as beneficiary. The court reserves jurisdiction over the issue of whether the defendant has the ability to acquire additional life insurance at reasonable cost. The defendant shall have the following options: CT Page 3320
a. Obtain $2,000,000 worth of term life insurance for so long as any child is under the age of 19 or has yet graduated from high school. The plaintiff shall be named beneficiary of said insurance. The defendant shall annually furnish the plaintiff with proof of coverage.
b. If the defendant rejects the prior option, then he shall submit to a physical examination to determine his eligibility for life insurance, and, if insurable, he shall obtain the premium costs of term insurance for the amount of $2,000,000, $2,500,000, and $3,000,000. This shall be completed within forty-five days. Either party may request a hearing thereafter on this issue.
18. Except for debts specifically mentioned in these orders, the parties shall each be responsible for the debts listed on his or her financial affidavits.
19. The dependent exemptions for the children shall be allocated to the plaintiff as it appears that the defendant's income will be beyond the level where the dependant exemptions phase out. It is possible that neither party will be entitled to the exemptions. The court retains jurisdiction of this issue and either party shall be entitled to a hearing if requested.
John W. Pickard, J.